IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| NORMA EGAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CUEBIQ INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Norma Egan ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant Cuebiq Inc. ("Cuebiq" or "Defendant").

## NATURE OF THE ACTION

1. Cuebiq violates state law by first acquiring and tracking consumers' precise geolocation data and other data using spyware, and then profiting from that data by selling it to others. The data can include consumers' movements to and from sensitive locations, like locations associated with medical care, reproductive health, religious worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, addiction recovery, or other at-risk populations.

2. Plaintiff is an individual who asserts claims on behalf of herself and other similarly situated individuals for unjust enrichment and violations of consumer protection statutes.

3. By selling this data without consent, Defendant has been unjustly enriched and has violated Plaintiff's privacy rights, state consumer protection and privacy statutes, and Section 5 of the Federal Trade Commission ("FTC") Act.

1

## JURISDICTION AND VENUE

4.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from any Defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

5.      This court has personal jurisdiction over Defendant because a substantial portion of the events giving rise to this cause of action occurred here.  Plaintiff is domiciled and suffered her primary injury in this district.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

7.      Plaintiff Norma Egan is a resident of Somerville, Massachusetts.  In or around January 2021, Plaintiff Egan downloaded a third-party phone application designed to allow users to know the location of their children or other family members (the "App").  At the time, Plaintiff believed that the geolocation data generated by the App would be used solely by the third-party App developer for App functionality.  However, that was not the case: the developer of that App later confirmed that it sold location data to Defendant (the "App") when Plaintiff used the application.  During that entire time, the App tracked the geolocation of Plaintiff Egan and her family.  In turn, Defendant tracked Plaintiff Egan's geolocation in Massachusetts, and then sold that data for profit.  Plaintiff suffered her primary injury in Massachusetts.

8.      During the time while Plaintiff used the App, Defendant bought Plaintiff's geolocation data from the App and then sold Plaintiff's location data to other third parties.

9. Plaintiff has not consented to have her geolocation data sold to third parties for valuable consideration. If Plaintiff had been aware that Defendant would receive and sell her geolocation data to third parties, Plaintiff would have not used the App.

10. Defendant Cuebiq Group, LLC is a Delaware corporation with its principal place of business in New York, New York. Defendant does not own any property in Massachusetts.

**GENERAL BACKGROUND**

A.   **Cuebiq Tracks And Identifies Users In "Real Time"**

11. Cuebiq's business model contains two parts. First, it "collects first-party" mobile application users' geolocation, by paying apps to integrate their SDK spyware. Then, on the other side of its business model, it sells this this data to whoever wants it.

12. The geolocation data is collected through a "Software Development Kit" or "SDK" that Cuebiq created. An SDK is piece of software code that any mobile application available on iOS or Android app stores can integrate with their software.

13. Cuebiq pays mobile application developers to integrate Cuebiq's SDK, into their apps.

14. Cuebiq's SDK's function is to collect the location data of all mobile application users which have SDK spyware embedded. According to Defendant itself:

> Location data can be collected in several ways, one of which is through a software development kit – an SDK. In layman's terms, Cuebiq's SDK is a line of code that our mobile app partners embed in their apps, which collects first-party data from anonymous users who opted-in to the location data collection. Through an SDK like Cuebiq's, you know exactly where the data is coming from and can ensure users are providing consent to data collection. This is why SDKs are the recommended methodology to collect data that is high-scale, accurate and dense, and follows a forward-thinking privacy framework — all of which are necessary for quality location data.

15. Once the SDK spyware is on a mobile application, Cuebiq receives the data whenever a user runs the application.

16. Even if an individual was aware of the spyware, he or she would have no ability to disable the transmissions to Cuebiq.

17. Cuebiq in fact touts that with their data customers can "see campaign performance in real time" "powered by the industry's largest source of first-party, high-quality, future-proofed location data collected on a daily basis."

18. The tracking SDK spyware always transmits the IP address of the user, which is used to derive location information for purposes of analytics and reporting.

19. Thus, through the use of its spyware, Cuebiq monitors, tracks, and identifies consumers in "real time," including Plaintiff and other putative class members in Massachusetts.

**B.  Cuebiq Sells Precise Location Information of Hundreds of Millions of Mobile Devices**

20. Cuebiq is primarily a location data broker that provides its customers massive amounts of precise geolocation data collected from consumers' mobile devices. Through

4

Cuebiq's services, customers can license location data including "real-time" and "future-proofed location data" of a consumer's mobile device which includes a timestamp of when a person was at the location.

21. Cuebiq declared that they were "thrilled to be among the first certified partners available within the AWS Data Exchange. This partnership makes Cuebiq' s industry-leading Visit Intelligence easily accessible to AWS customers." This partnership also allowed Cuebiq to offer their sensitive location data to the public on Amazon Web Services ("AWS") Marketplace.

22. Any person can buy Cuebiq's geolocation "visitation insights" on the AWS Marketplace.

23. This data is used by clients for measuring "the impact of your cross-channel media [ad] campaigns to understand which channel or messaging drives incremental visits." For example, "Cuebiq's platform provides you with budget recommendations that will help you adjust campaign tactics in real time, to get the most from your ad dollars."

24. More alarmingly, Cuebiq can "target" "geo-behavioral audiences" to "target movie goers, gym lovers, apparel shoppers, and more based on offline behaviors and purchase intent" and "brand audiences" for example "Starbucks fans, Macy's shoppers, and others visiting specific brick-and-mortar brand locations."

25. Cuebiq uses "various identifiers" including Mobile Advertising ID ("MAID") to match location data with specific mobile users. MAIDs are unique identifiers assigned to a consumer's mobile device to assist marketers in advertising to the consumer.

26. Cuebiq thus sells SDK-sourced geolocation correlated to the MAIDs of potentially millions of mobile users which includes coordinates obtained through GPS features of their SDK, Wi-Fi data, cell tower triangulation, dwell times near points of interest, MAIDs, time

and date information, device type, operating system version and type, device settings, device time zone, device carrier, current IP address, and applications on which the SDK is embedded.

27. Plaintiff and class members had no knowledge that Cuebiq, a third party that few if any had ever heard of, was obtaining their location data. These mobile users never consented to the sale of their location data by Cuebiq.

### C. Cuebiq's Data Can Be Used to Identify People and Track Them to Sensitive Locations

28. Precise geolocation data associated with MAIDs, such as the data sold by Cuebiq, may be used to track consumers to sensitive locations, including places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, medical facilities, and welfare and homeless shelters.

29. By plotting the latitude and longitude coordinates provided by Cuebiq with publicly available map programs, it is possible to identify which consumers' mobile devices visited reproductive health clinics. Further, because each set of coordinates is time-stamped, it is also possible to identify when a mobile device visited the location. Similar methods may be used to trace consumers' visits to other sensitive locations.

30. The location data provided by Cuebiq is not anonymized for all Cuebiq's customers, or alternatively, is easily de-anonymized. It is possible to use the geolocation data, combined with the mobile device's MAID, to identify the mobile device's user or owner. For example, some data brokers advertise services to match MAIDs with "offline" information, such as consumers' names and physical addresses.

31. Location data can be easily used to identify people. The location data sold by Cuebiq typically includes multiple timestamped signals for each MAID.

32. By plotting each of these signals on a map, much can be inferred about the mobile device owners. For example, the location of a mobile device at night likely corresponds to the

6

consumer's home address. Public or other records may identify the name of the owner or resident of a particular address.

33. Cuebiq employs few technical controls to prohibit its customers from identifying consumers or tracking them to sensitive locations. In fact, Cuebiq admits that "[t]here are relationships where we provide a Mobile Ad ID with the data."

**D. Defendant's Practices Cause and Are Likely to Cause Substantial Injury to Consumers**

34. As described above, the data sold by Defendant may be used to identify individual consumers and their visits to sensitive locations. The sale of such data poses an unwarranted intrusion into the most private areas of consumers' lives and causes or is likely to cause substantial injury to consumers.

35. For example, the data may be used to identify consumers who have visited an abortion clinic and, as a result, may have had or contemplated having an abortion.

36. In fact, it is possible to identify a mobile device that visited a women's reproductive health clinic and trace that mobile device to a single-family residence. The data set can also reveal that the same mobile device was at a particular location at least three evenings in the same week, suggesting the mobile device user's routine. The data may also be used to identify medical professionals who perform, or assist in the performance, of abortion services.

37. As another example, the data could be used to track consumers to places of worship, and thus reveal the religious beliefs and practices of consumers.

38. As another example, the data could be used to track consumers who visited a homeless shelter, domestic violence shelter, or other facilities directed to at-risk populations. This information could reveal the location of consumers who are escaping domestic violence or other crimes.

39. In addition, because Defendant's data allows its customers to track consumers over

time, the data could be used to identify consumers' past conditions, such as homelessness.

40. As another example, the data could be used to track consumers who have visited addiction recovery centers. The data could show how long consumers stayed at the center and whether a consumer relapses and returns to a recovery center.

41. Identification of sensitive and private characteristics of consumers from the location data sold and offered by Defendant injures or is likely to injure consumers through exposure to stigma, discrimination, physical violence, emotional distress, and other harms.

42. These injuries are exacerbated by the fact that once Defendant sells the data, it lacks any meaningful controls over who accesses its location data feed.

43. The collection and use of consumer location data are opaque to consumers, who typically do not know that someone has sold or purchased their location data or how it is being used. Indeed, once information is collected about consumers from their mobile devices, the information can be sold multiple times to companies that consumers have never heard of and never interacted with. Consumers have no insight into how this data is used – they do not, for example, typically know or understand that the information collected about them can be used to track and map their past movements and that inferences about them and their behaviors will be drawn from this information for marketing or other purposes unrelated to the mobile applications they use. Consumers are therefore unable to take reasonable steps to avoid the above-described injuries.

44. Moreover, like many data harvesting companies, Cuebiq claims that it only collects information from people who "opted-in" to the collection of their geolocation data. That is false. Plaintiff and Class members never consented to providing their valuable location information to Defendant so that Defendant could sell it to other third parties. Plaintiff and class members were never even given notice that such an arrangement existed.

45. The harms described above are not outweighed by countervailing benefits to

consumers or competition.

46. According to the FTC, the "Unfair Sale of Sensitive Data," as described above constitutes a violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair or deceptive acts or practices in or affecting commerce."

47. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## CLASS REPRESENTATION ALLEGATIONS

48. Plaintiff seeks to represent a class defined as all persons in the United States whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Class").

49. Plaintiff also seeks to represent a subclass defined as all Class members who reside in the Commonwealth of Massachusetts whose data, including but not limited to their geolocation data, was sold by Defendant without their consent (the "Massachusetts Subclass").

50. Subject to additional information obtained through discovery, the foregoing class definitions may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

51. Members of the Class and Massachusetts Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Massachusetts Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class

members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

52. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include but are not limited to whether Defendant's sale of geolocation data without consent constitutes unjust enrichment.

53. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff's data was sold by Defendant without her consent, and the named Plaintiff suffered injury as a result of Defendant's conduct.

54. Plaintiff is an adequate representative of the Class and Massachusetts Subclass because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

55. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Unjust Enrichment

56.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

57.     Plaintiff brings this claim individually and on behalf of members of the Class and the Massachusetts Subclass against Defendant.

58.     Plaintiff and Class members unwittingly conferred a benefit upon Defendant. Defendant acquired valuable personal location information belonging to Plaintiff and Class members which it then sold to other parties without the consent of Plaintiff and Class members. Plaintiff and Class members received nothing from this transaction.  Plaintiff lacks an adequate remedy at law, and pleads this cause of action in the alternative to the extent Plaintiff is required to do so.

59.     Defendant has knowledge of such benefits.

60.     Defendant has been unjustly enriched in retaining the revenues derived from the sale of Plaintiff's and Class members' data, including their geolocation data.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant did not obtain the consent of Plaintiff and Class members before selling their data to third parties as described above.

61.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court.

## COUNT II
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws Ch. 93A *et seq.***

62. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

63. Plaintiff brings this claim individually and on behalf of the members of the Massachusetts Subclass against Defendant.

64. Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("93A")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."

65. It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. Ch. 93A, § 2.

66. An act or practice is a violation of 93A if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. Ch. 93A, § 2." 940 CMR 3.16.

67. Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing

12

that he adequately and fairly represents such other persons, bring the action on behalf of herself and such other similarly injured and situated persons."

68. Pursuant to the definitions codified in Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by engaging in the purchase and sale of Products that directly or indirectly affect the people of Massachusetts.

69. By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

70. Defendant's misrepresentations deceive and have a tendency to deceive a reasonable consumer and the general public.

71. Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and omissions described above and would be induced to act on the information in deciding to use services such as phone applications.

72. Defendant has also committed a violation of 93A predicated on its violations of FTC regulations – specifically, its violation of Section 5 of the FTC Act as interpreted by the Federal Trade Commission.

73. Plaintiff and members of the Massachusetts Subclass had no idea that Defendant was selling their location data.

74. Plaintiff and members of the Massachusetts Subclass did not consent to Defendant's sale of their location data.

75. Defendant in conjunction with third party phone and internet applications knowingly omitted that Defendant had access to and was selling the location data of Plaintiff and the Massachusetts Subclass.

76. Had Plaintiff and Massachusetts Subclass members known that the Defendant was selling their data, they would either have ceased to use the relevant phone applications or would have requested compensation for the misappropriation and sale of their location data.

77. Plaintiff and Massachusetts Subclass Members were injured as a direct and proximate result of Defendant's breach because Defendant misappropriated and sold the location data of Plaintiff and Massachusetts Subclass members without consent.

78. Plaintiff and members of the Massachusetts Subclass have been harmed by this injury, adverse consequence, and/or loss.

79. 93A represents a fundamental public policy of the Commonwealth of Massachusetts.

80. For each loss, Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

81. Disgorgement of profit derived from an unfair and deceptive act or practice is a permissible damage remedy under M.G.L. Ch. 93A, § 9.

82. Accordingly, Plaintiff and the members of the Massachusetts Subclass seek the disgorgement of profits that Defendant derived from the sale of their location data.

83. Because Defendant acted willfully or knowingly, Plaintiff and each member of the Massachusetts Subclass may recover up to three but not less than two times this amount.  In addition, Plaintiff may recover attorneys' fees and costs.

84. Plaintiff and each member of the Massachusetts Subclass may recover an award of actual damages (in this case unlawful profit derived from the sale and trading of location data) or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

85. Plaintiff and the members of the Massachusetts Subclass may also seek the imposition of an injunction relief which limits and polices Defendant's representations within or

reaching Massachusetts. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Massachusetts Subclass, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the nationwide Class and the Massachusetts Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and the Massachusetts Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and the Massachusetts Subclass members;

b. For an order declaring that Defendant's conduct violates the laws referenced herein;

c. For an order finding in favor of Plaintiff, the nationwide Class, and the Massachusetts Subclass on all counts asserted herein;

d. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e. For prejudgment interest on all amounts awarded;

f. For an order of restitution and all other forms of equitable monetary relief;

g. For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

h. For an order awarding Plaintiff and the Class and Massachusetts Subclass their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated: July 25, 2023

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Joel D. Smith.*
   Joel Smith

**BURSOR & FISHER, P.A.**
Joel D. Smith (BBO 712418)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jsmith@bursor.com

**BURSOR & FISHER, P.A.**
Julian C. Diamond (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jdiamond@bursor.com

*Attorneys for Plaintiff*